**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DCP OPERATING COMPANY, LP
& DCP MIDSTREAM, LP,

       *Plaintiffs,*

v.                                No. 2:24-cv-00628-SMD-KRS

ST. PAUL FIRE AND MARINE INS. CO.,

       *Defendant.*

**OMNIBUS OPINION AND ORDER GRANTING IN PART PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

     **THIS MATTER** is before the Court on Plaintiffs DCP Operating Company and DCP

Midstreams' (collectively "DCP") motion for partial summary judgment.  Doc. 55 ("Pls.' SJ

Mot.").  Defendant St. Paul Fire and Marine Ins. Co. ("St. Paul") filed its response, and Plaintiffs

filed their reply.  Doc. 67 ("Def.'s Resp."); Doc. 63 ("Pls.' Reply").

     The Court also considers Defendant's amended motion for summary judgment on

Plaintiff's related breach of contract claim, which encompasses the duty to defend and the duty to

indemnify.  Doc. 66 ("Def.'s SJ Mot.").  Plaintiffs filed their response, and Defendant filed its

reply.  Doc. 57; Doc. 68.

**FACTUAL BACKGROUND**

     The case arises from a contractual dispute between Plaintiffs DCP and Defendant St. Paul.

Doc. 1 ("Compl.").  The dispute centers on whether St. Paul has a duty to defend and indemnify

DCP in an underlying personal injury action.  *See* Pls.' SJ Mot. at 1; Def.'s SJ Mot. at 1.

     DCP operates a gas processing plant in Hobbs, New Mexico, named the Linam Ranch.

Compl. ¶ 22.  After identifying several nonfunctioning pipeline drains designed to remove

condensate from line RR4-6-7, DCP decided to install siphons at existing drip locations to remedy the issue. *Id*. ¶¶ 23–24. On April 14, 2017, DCP entered into a Master Goods and Services Agreement ("MGSA") with J&M Welding & Fabrication, Inc. ("J&M") to perform welding services related to the installation. *Id*. ¶¶ 9, 25. J&M assigned two employees, Jose Owens and Manuel Saenz, to the project. *Id*. ¶ 25. On October 28, 2021, Owens and Saenz were injured in a welding accident at the site. *Id*. ¶ 26. Owens, Saenz, and their families later sued DCP in a New Mexico state court.[1]

Under the MGSA, J&M was required to maintain insurance coverage underwritten by a carrier with an AM Best's insurance rating of A-VIII or higher, naming DCP as an additional insured. *Id*. ¶ 10. J&M obtained Policy No. ZLP-10S9682A ("Policy") from St. Paul.[2] *Id*. ¶ 12. The Policy included an Additional Protected Persons Endorsement extending coverage to entities that J&M agreed in writing to name as additional insureds. *Id*. ¶ 14. After the welding accident, DCP tendered the defense of the Underlying Action to J&M and St. Paul and requested St. Paul to defend it as an additional insured under the Policy. *Id*. ¶¶ 17, 29. St. Paul denied coverage. *Id*. ¶ 32.

DCP subsequently filed suit against J&M in Colorado pursuant to the MGSA's forum selection clause. Pls.' Reply at 11; Doc. 57-1 at 4–12. DCP then brought this action against J&M's insurer St. Paul, alleging breach of contract, insurance bad faith, and violation of the New Mexico Unfair Insurance Practices Act. Compl. ¶¶ 38–42, ¶¶ 43–47, ¶¶ 48–52.

---

[1] The action, *Manuel Saenz v. DCP Operating Company, LP.* ("Underlying Action"), Case No. D-101-CV-2021-02435 (N.M. 1st Jud. Dist. 2021), was filed in the First Judicial District Court in Santa Fe County. Compl. ¶ 28.

[2] Defendant St. Paul noted in its Corporate Disclosure Statement, Doc. 3, that pursuant to Federal Rule of Civil Procedure 7.1, it was improperly designated as "Travelers Indemnity Company" in the Complaint and some other pleadings. St. Paul is wholly owned by The Travelers Companies, Inc.

Here, DCP moves for partial summary judgment regarding whether Defendant St. Paul owed a duty to defend DCP in connection with the Underlying Action. Pls.' SJ Mot. at 1. St. Paul, in turn, files a cross-motion for summary judgment, requesting judgment in its favor on DCP's breach of contract claim. Def.'s SJ Mot. at 1. St. Paul contends that it did not breach the insurance policy when it declined to defend or indemnify DCP in the Underlying Action. *Id.*

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1140 (10th Cir. 2023). The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this requirement is met, the non-movant can defeat summary judgment by showing that there is a genuine dispute of material facts. *Id.* The non-movant's response must "set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). The court then reviews the proffered evidence and, drawing all reasonable inferences in favor of the nonmoving party, determines whether the facts "establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

## DISCUSSION

### I.    Undisputed Material Facts

The Court begins with the parties' statements of undisputed material facts ("UMFs") and construes any disputed fact in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Local Rule 56.1 instructs that each disputed fact "must be numbered,

must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed." D.N.M.LR-Civ. 56.1(b). If the non-movant fails to controvert a material fact with a citation to the record, that fact is deemed undisputed. *Id.*; *see, e.g.*, *Martin v. City of Albuquerque*, 147 F. Supp. 3d 1298, 1336 n.3 (D.N.M. 2015). The following recitation of facts draws from parties' summary judgment filings, including DCP's motion, St. Paul's motion, and the associated responses and replies. Pls.' SJ Mot. at 3–11 ("Pls.' UMF"); Doc. 66 at 6–9 ("Def.'s UMF"); Def.'s Resp. at 5–11("Def.'s Resp. to Pls.' UMF"); Doc.57 at 3–6 ("Pls.' Resp. to Def.'s UMF").

A DCP entity and J&M entered into a Master Goods and Services Agreement ("MGSA"). Pls.' UMF Fact No.3; Def.'s Resp. to Pls.' UMF ¶ 2. Under the MGSA, J&M was engaged to install siphons on RR4-6-7 to address a chronic problem with vapor buildup along the line. Def.'s UMF ¶ 5; Pls.' Resp. to Def.'s UMF at 3. On October 28, 2021, J&M employee Manual Saenz sustained injury while performing welding work at DCP's request. Pls.' UMF Fact No. 1, Fact No. 2; Def.'s Resp. to Pls.' UMF ¶ 1. The pipeline involved in the incident, identified as RR4-6-7, was a "gathering line" connected to the main line that transported gas from producer wells to Linam Ranch, serving as a conduit for pre-process gas. Def.'s UMF ¶¶ 2, 3; Pls.' Resp. to Def.'s UMF at 3.

In connection with the project, Section 9 of the MGSA required J&M to procure insurance of a specified grade at DCP's request and with DCP's permission. Pls.' UMF Fact No. 6; Def.'s Resp. to Pls.' UMF ¶ 4. Pursuant to this requirement, J&M obtained Policy No. ZLP-10S9682A-21N4 ("Policy") from St. Paul, which included the Oil and Gas Commercial General Liability

Protection Endorsement (OG001 Rev.1-16) that defined St. Paul's coverage obligations as follows:[3]

> **Bodily injury and property damage liability.** We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:
>
> - happens while this agreement is in effect; and
> - is caused by an event.
>
> . . .
>
> **Right and duty to defend.** We'll have the right and duty to defend any protected person against a claim or suit for injury or damage or pollution clean up costs covered by this agreement. We'll have such right and duty even if all of the allegations of the claim or suit are groundless, false, or fraudulent. But we won't have a duty to perform any other act or service. [¶] We'll have the right to investigate any event, offense, claim, or suit to the extent that we believe is proper. […]
>
> . . .
>
> Bodily injury means any physical harm, including sickness or disease, to the physical health of other persons.
>
> . . .
>
> Event means an accident, including:
> - continuous or repeated exposure to substantially the same general harmful conditions[.]

Pls.' UMF Fact No. 9; Ex. C at 102, 107; Def.'s Resp. to Pls.' UMF ¶ 6.

The policy also incorporates Endorsement OG037 (Rev. 01-16), titled "Additional Protected Persons Endorsement", which provides in relevant part as follows:

> 1. The following is added to the Who Is Protected Under This Agreement section.
>
> **Additional protected persons required by written contract for Insurance.** All persons or organizations that you agree in a written

---

[3] St. Paul does not dispute that it issued J&M a policy with the stated number. It argues instead that there is no evidence before the Court showing that the policy concerned is "in any way related to J&M's contract with any DCP company or any insurance requirement thereunder." The Court will deem this fact undisputed because St. Paul later concedes that DCP was an organization that J&M agreed in writing to name as an additional protected person under the Policy. Def.'s Resp. at 13; Doc. 55 Fact No. 11.

contract for insurance to add as additional protected persons under
this agreement are protected persons only for covered bodily injury
or property damage that results from your work, to which that
written contract for insurance applies, for any of those persons or
organizations.  No such person or organization is a protected person under
this paragraph for the following:

- Bodily injury or property damage that,
  if covered by this agreement, would
  result in coverage broader than
  required by contract.

Pls.' UMF Fact No. 10; Ex. C at 145; Def.'s Resp. to Pls.' UMF ¶ 6; Def.'s UMF ¶ 21.

DCP was an organization that J&M agreed in a written contract for insurance to add as an
additional protected person under the Policy.  Def.'s Resp. to Pls.' UMF ¶ 13; Pls.' UMF Fact No.
11.

After sustaining injury, Saenz filed suit against DCP in November 2021 ("Underlying
Action").  Pls.' UMF Fact No. 12; Def.'s Resp. to Pls.' UMF ¶ 12.  The underlying complaint
alleges that negligence by DCP entities and personnel proximately caused the injuries to Saenz
and Owens.  Def.'s UMF ¶ 7; Pls.' Resp. to Def.'s UMF at 3.  The underlying complaint does not
allege negligence or causation against J&M arising from the incident.  Def.'s UMF ¶ 8; Pls.' Resp.
to Def.'s UMF at 3.

The settlement agreements entered between the DCP entities and the individuals named in
the Underlying Action released those parties only from "claims alleged by [p]laintiff against DCP."
Def.'s UMF ¶ 9; Pls.' Resp. to Def.'s UMF at 3.  J&M is not included among the released parties.
Def.'s UMF ¶ 10; Pls.' Resp. to Def.'s UMF at 3.

DCP sent two letters to St. Paul tendering the matter for defense and indemnification, citing
the MGSA and J&M's obligation to defend and indemnify DCP against third-party claims arising
from bodily injuries caused by J&M's personnel.  Pls.' UMF Fact No. 21; Def.'s Resp. to Pls.'

UMF ¶ 15.  St. Paul denied the tender and maintained that it had no duty to defend or indemnify DCP.  Pls.' UMF Fact No. 23; Def.'s Resp. to Pls.' UMF ¶¶ 17, 18.

In 2023, in addition to the present action and the Underlying Action between DCP and Saenz, DCP filed a separate lawsuit against J&M in Colorado state court, Case No.: 2023CV31339, asserting an affirmative claim against J&M based on the MGSA's indemnity provision.  Pls.' Resp. to Def.'s UMF Fact B; Def.'s Resp. to Pls.' UMF ¶ 3.

## II.     Parties' Arguments

### a.     DCP's Interpretation: Coverage Triggered by the "Results From" Standard

DCP argues that St. Paul's duties to defend and indemnify are triggered under the Policy's Additional Protected Persons Endorsement, which extends coverage to entities that J&M "agree[s] in a written contract for insurance."  Pls.' UMF Fact No. 10; Ex. C at 145; Def.'s Resp. to Pls.' UMF ¶ 6; Def.'s UMF ¶ 21.

DCP emphasizes that the endorsement covers bodily injury or property damage that "results from" J&M's work.  Pls.' SJ Mot. at 15.  According to DCP, this phrase requires only a simple causal connection between the injury and J&M's operations, not proof of J&M's negligence or fault.  *Id*.

DCP acknowledges that the underlying complaint does not allege negligence by J&M and instead attributes negligence to DCP and its personnel for failing to maintain safe working conditions during the welding project.  Def.'s UMF ¶ 8; Pls.' Resp. to Def. UMF at 3.  Still, DCP argues that coverage under the endorsement is not confined to situations in which J&M is alleged to be negligent.  Pls.' SJ Mot. at 15–16.  Rather, DCP contends that the endorsement extends coverage whenever the injury arises out of J&M's work, regardless of which party is alleged to be at fault.  *Id*.

7

Applying this reasoning, DCP argues that the Underlying Action falls within the Policy's scope because the injuries occurred while Saenz and Owens were acting in their capacity as J&M employees at DCP's facility, where vapors ignited and caused burns. Pl.'s SJ Mot. at 15–16. In DCP's view, the causal link between J&M's welding work and the injury satisfies the "results from" standard. *Id.* DCP asserts that St. Paul's denial of coverage on the ground that J&M was not expressly alleged to be negligent improperly adds a negligence requirement and narrows the Policy beyond its plain terms. *Id.* at 22.

DCP further relies on the Joint Status Report, which states that "[t]wo J&M employees, Jose Owens and Manual Saenz were <u>performing welding work</u> on a pipeline when gas vapor ignited <u>resulting</u> in burns to Mr. Owens and Mr. Saenz." *Id.* at 21 (emphasis added); Pls.' UMF Fact No. 17. DCP contends that this stipulation confirms the causal relationship between J&M's work and the injuries, which is sufficient to trigger St. Paul's duty to defend. Pls.' SJ Mot. at 15. DCP therefore maintains that St. Paul's refusal to accept the tender contradicts the Policy's terms. *Id.* at 22.

b.  <u>St. Paul's Interpretation: Coverage Triggered Only When J&M Is Negligent</u>

St. Paul reads the endorsement differently. St. Paul contends that DCP's interpretation divorces the Policy from the written contract it references, the MGSA. Def.'s Resp. at 13.

St. Paul maintains that, when read in conjunction with the MGSA, the parties' agreement makes clear that a causal connection alone is insufficient to trigger coverage. Def.'s Resp. at 13; Def.'s SJ Mot. at 13. According to St. Paul, the Policy does not create an independent duty to defend DCP; rather, it mirrors the scope of J&M's contractual obligations in the MGSA and limits coverage to circumstances in which J&M is negligent. Def.'s Resp. at 14.

To bolster this interpretation, St. Paul relies on Section 9C of the MGSA, which requires J&M to name DCP and its affiliates as additional insureds "to the extent of the indemnification obligations assumed by [J&M] hereunder." *Id*.

Section 9C of the MGSA provides:

> **C. Additional Insured and Primary Coverage.** The Required Insurance shall be (i) endorsed to name [DCP], its Affiliates, and their respective officers, directors, shareholders, members, partners, and employees (the "Additional Insured Persons") as additional insureds or provide blanket additional insured status that covers the Additional Insured Persons as additional insureds, except in the case of Workers' Compensation, and (ii) the primary coverage without any right of contribution from any other insurance held by any Additional Insured Person, *in each case, to the extent of the indemnification obligations assumed by [J&M] hereunder*.

Doc. 55-1 at 9 (emphasis added).

In St. Paul's view, the language of Section 9C confines both J&M's insurance obligation and St. Paul's corresponding coverage obligation to situations in which J&M has a duty to indemnify. Def.'s Resp. at 14. Section 14A, which defines those indemnification obligations, in turn limits them to losses caused by the negligent or wrongful act or omission of J&M or its personnel. *Id*.

Because the underlying pleading identifies DCP alone as the negligent actor, St. Paul contends that the endorsement is not triggered, and it therefore owes no duty to defend or indemnify DCP. Def.'s Resp. at 18; Doc. 67 at 17–18.

Finally, St. Paul rejects DCP's reliance on the Joint Status Report. Def.'s Resp. to Pls.' UMF ¶ 11. St. Paul maintains that DCP misreads the Policy by treating the "results from" language as the governing standard. Def.'s Resp. at 13; Def.'s SJ Mot. at 15. In St. Paul's view, the endorsement must be read together with the MGSA, which limits coverage to losses caused by J&M's own negligence. Def.'s Resp. at 13–14. St. Paul further argues that DCP cannot establish

9

even a causal connection under its own theory. *Id*. at 17–18. The Joint Status Report, St. Paul asserts, merely states that Saenz and Owens, both J&M employees, were welding when vapors ignited. Def.'s Resp. to Pls.' UMF ¶ 11. The report does not concede that J&M's work caused the accident, but only that the two events occurred consecutively. *Id*.; Def.'s SJ Mot. at 14–15. Because the underlying complaint contains no allegation of negligence or misconduct by J&M, St. Paul concludes that the Policy affords no coverage. Def.'s SJ Mot. at 15.

### III.    The Oilfield Anti-Indemnity Statute Does Not Apply; the Construction Anti-Indemnity Statute Applies and Limits St. Paul's Coverage to J&M's Negligence.

To further support its position that insurance coverage is limited to J&M's negligence, St. Paul argues that New Mexico's oilfield and construction anti-indemnity statutes apply to the MGSA and confine St. Paul's obligation to defend or indemnify to losses arising from J&M's own fault. Def.'s Resp. at 15–16. St. Paul maintains that, regardless of which contractual interpretation governs, if either anti-indemnity statute applies to the contracts at issue, it bars indemnification for the indemnitee's own negligence and therefore limits St. Paul's coverage obligations to instances in which J&M's negligence caused the injury. Def.'s SJ Mot. at 19.

St. Paul first invokes the oilfield anti-indemnity statute, N.M. Stat. Ann. § 56-7-2 (2024), which governs "agreement[s] pertaining to a well," and contends that the MGSA falls within that category because it involves welding work on a gas pipeline that transports gas from wells to a compressor station and then to a processing plant. Def.'s SJ Mot. at 18; Def.'s Resp. at 15–16. St. Paul also argues that the construction anti-indemnity statute, § 56-7-1, applies because the MGSA concerns welding and installation on real property, which constitutes construction work within the scope of § 56-7-2. Def.'s Resp. at 15; Def.'s SJ Mot. at 19–21. According to St. Paul, the effect of these statutes is categorical: any indemnity or insurance provisions that extend beyond J&M's own negligence are void as against public policy. Def.'s Resp. at 16; Def.'s SJ Mot. at 22.

10

DCP disputes both contentions.  Pls.' Reply at 15; Doc.57 at 25.  It argues that the oilfield statute does not apply because the welding work on RR4-5-7 pipeline at the Linam Ranch processing facility involved gas processing, which falls outside the statute's reach.  Pls.' Reply at 19.  The statute, DCP notes, applies only to the operation or production of oil or gas at a well.  *Id*. DCP further argues that even if the anti-indemnity restrictions apply, they do not invalidate the MGSA or alter St. Paul's obligation to provide coverage under the Policy.  Pls.' Reply at 15; Doc. 57 at 19.

The Court must first determine whether either statute applies to the MGSA and the Policy and, if so, what effect that application has on St. Paul's duty to defend and indemnify DCP for the Underlying Action.

   a.   § 56-7-2 Oilfield Anti-Indemnity Statute Only Applies to Operations at the Wellhead.

Section 56-7-2(A) of the New Mexico oilfield anti-indemnity statute provides in relevant part:

> "[a]n contract, covenant or promise, foreign or domestic, contained in, collateral to or affecting an agreement pertaining to a well for oil, gas or water, or mine for a mineral, within New Mexico, that purpose to indemnify the indemnitee against loss or liability for damages arising from the circumstances specified in Paragraph (1), (2) or (3) is against public policy and is void."

N.M. Stat. Ann. § 56-7-2.

Subsection (B)(1) further clarifies that the statute covers:

> any operations related to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging or otherwise rendering services in connection with a well drilled for the purpose of producing or disposing oil, gas or other minerals or water;

*Id*.

The statute's plain text limits its reach to activities "pertaining to a well" and enumerates specific operations that share a close functional relationship to drilling or production.  *Id*.  New

Mexico courts have interpreted § 56-7-2 narrowly in some cases, confining its application to activities occurring at or directly connected to the wellhead. *See Holguin v. Fulco Oil Servs.*, 245 P.3d 42 (N.M. 2018); *St. Paul Fire & Marine Ins. Co. v. Sedona Contracting, Inc.*, 474 F. Supp. 3d 1211 (D.N.M. 2020).

In *Holguin v. Fulco Oil Servs.*, 245 P.3d 42 (N.M. 2018), the court examined whether work performed on a post-production gas-processing unit, referred to as a "slug catcher," fell within the statute. *Id*. ¶ 4. Applying the *ejusdem generis* canon to interpret the catch-all phrase "otherwise rendering services in connection with a well" in the oilfield anti-indemnity statute, the court concluded that the legislature did not intend the statute to include activities removed from drilling or production. *Id*. ¶ 22.

After examining the list of enumerated operations in § 56-7-2 (B), which include "drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, and plugging," *Holguin* identified a common characteristic: each is a production-related operation performed at the wellhead. *Id*. ¶ 23. Based on that analysis, *Holguin* concluded that the statute governs only operations directly involved in drilling or production and excludes "any activities related to the distribution or transportation of oil and gas." *Id*. ¶ 19 (citing N.M. Stat. Ann. § 56–7–2(B)). *Holguin* then determined that cleaning a slug catcher did not fall within the scope of the statute because the work occurred away from the well site and did not form part of the production process. *Id*. ¶ 25. The court explained that the legislature intended § 56-7-2 to reach only production activities of the same kind as those listed in subsection (B) and that extending it to off-site processing activities would make the enumerations in (B) meaningless. *Id*. ¶ 24.

The analysis in *Holguin* was further developed in *St. Paul Fire & Marine Ins. Co. v. Sedona Contracting, Inc.*, 474 F. Supp. 3d 1211 (D.N.M. 2020), which involved a contract for the disposal of saltwater at oil wells. The plaintiff in *Sedona* relied on *Holguin* and argued that the pipeline at issue fell outside the scope of § 56-7-2 because it was not located at the wellhead and instead transported wastewater to a tank battery away from the well site. *Id.* at 1219. The court disagreed, reasoning that the removal and disposal of saltwater were integral to the production of oil and gas and that the operations at issue remained directly connected to the wellhead. *Id.* at 1220.

*Sedona* modestly expanded *Holguin*'s narrow interpretation, which had confined the statute to production activities occurring at the wellhead, stressing functional necessity rather than strict geographic proximity. *Id.* *Sedona* clarified that § 56-7-2 may also encompass production operations that are directly connected to the wellhead, even if they are not physically located at it. *Id.* While recognizing a limited extension of *Holguin*, *Sedona* reaffirmed its central holding that § 56-7-2 governs only production-related activities and not downstream transportation, distribution, or processing. *Id.*

Taken together, *Holguin* and *Sedona* establish that the oilfield anti-indemnity statute applies to contracts involving operations that are integral to oil and gas production at or immediately connected to the wellhead. The statute does not extend to agreements dealing with post-production or processing functions that occur farther along the chain of distribution.

b.  <u>§ 56-7-2 Does Not Apply to the MGSA and the Policy.</u>

The parties dispute whether the MGSA is an "agreement pertaining to a well" within the meaning of § 56-7-2. St. Paul maintains that it is. Def.'s Resp. 15. It argues that the RR4-6-7 line is a "gathering line" that transports pre-process gas from wells to Linam Ranch facility for processing, and that work performed on this line therefore forms part of the production chain.

Def.'s SJ Mot. at 21 (citing Def.'s UMF ¶ 2). In St. Paul's view, J&M's welding and siphon-installation work directly supported the extraction process by ensuring the transport of gas from the wellheads to the compressor station. *Id*. St. Paul likens this work to the saltwater disposal operations in *Sedona*, where the court found the oilfield statute applicable because the contract involved services integral to production. *Id*. (citing Def.'s UMF ¶¶ 2–5).

DCP, by contrast, contends that the MGSA concerns post-production activity. Pls.' Reply at 14. It emphasizes that J&M's work was performed on a section of the RR4-6-7 pipeline located near DCP's Linam Ranch processing plant, approximately half a mile from the facility, and that the purpose of the work was to install siphons used to remove gas condensate and vapor. *Id*. DCP asserts that the welding work related to processing operations, not to the production of gas at the wellhead. *Id*. It argues that this context makes the MGSA analogous to the contract performing post-production processing work in *Holguin*, which the court concluded was outside the scope of § 56-7-2. *Id*. DCP and St. Paul do not agree on the function and structure of the pipe, namely whether it is directly connected to the wellhead. DCP disputes that the pipe directly connected to the wellhead but did not further specify the structure of the pipe. *Id*. (citing *Holguin*, 245 P.3d 42, ¶ 23).

The record supports DCP's position. The RR4-6-7 line connects producing wells to DCP's Linam Ranch plant, where gas is processed and treated. Def.'s UMF ¶ 2; Pls.' Resp. to Def.'s UMF at 3. The work governed by the MGSA occurred on that line near Linam Ranch, not at a well site. Def.'s UMF ¶ 6; Pls.' Resp. to Def.'s UMF at 3. J&M's task under the MGSA was to weld and install siphons designed to facilitate the flow of gas into the processing facility, not to drill, rework, or otherwise service wells. Def.'s UMF ¶ 5; Pls.' Resp. to Def.'s UMF at 3. These

undisputed facts place the MGSA within the category of contracts addressing processing rather than production.

New Mexico precedent makes clear that the oilfield anti-indemnity statute applies only to operations that are part of or immediately connected to a well production. *See Holguin*, 245 P.3d at 47; *St. Paul Fire & Marine Ins. Co.*, 474 F. Supp. 3d at 1220. The statute does not extend to contracts involving the transportation, treatment, or processing of gas after it has left the production stage. The work performed under the MGSA fits within this latter category. *Holguin*, 245 P.3d 42, ¶ 23. J&M's welding and siphon installation took place on a pipeline segment near the Linam Ranch processing facility and involved equipment intended to aid the delivery of gas for processing. *See* Def.'s UMF ¶ 3; Pls.' Resp. to Def.'s UMF at 3. The activity was therefore part of downstream operations rather than production itself and falls outside the scope of § 56-7-2.

    c.   <u>The Construction Anti-Indemnity Statute § 56-7-1 Applies to the MGSA and the Policy.</u>

Alternatively, St. Paul argues that N.M. Stat. Ann. § 56-7-1 (2024) applies and it invalidates any contractual promise requiring J&M to indemnify DCP for DCP's own negligence. Def.'s Resp. at 15; Def.'s SJ Mot. at 23–24.

Section 56-7-1(A) provides that:

> a public, private, foreign or domestic contract or agreement relating to <u>construction, alteration, repair or maintenance</u> of any real property in New Mexico and includes agreements for architectural services, demolition, design services, development, engineering services, excavation or other improvement to real property, including buildings, shafts, wells and structures, whether on, above or under real property.

(emphasis added); N.M. Stat. Ann. § 56-7-1.

St. Paul argues that § 56-7-1 applies because the MGSA is a "construction contract" that involves the alteration and maintenance of real property within the meaning of the construction

anti-indemnity statute. Def.'s SJ Mot. at 23–24. St. Paul notes that J&M performed alteration work on the RR-4-6-7 pipeline, including the installation of siphons and a valve setting onto the pipeline. *Id*. at 23 (citing Def.'s UMF ¶¶ 1–5). DCP counters that the work does not constitute an "improvement" within the meaning of the statute and therefore should not be construed as a construction contract. Pls.' Reply at 14.

New Mexico precedents recognize that § 56-7-1 is "based on a public policy promoting safety in construction projects by holding each party to the contract accountable for injuries caused by its own negligence" and should therefore be interpreted broadly. *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 213 P.3d 1146 (N.M. 2009); *see also United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 237 P.3d 728, 733 (N.M. 2010).

The New Mexico Court of Appeals addressed the scope of the construction anti-indemnity statute in *Holguin v. Fulco Oil Servs.*, 245 P.3d 42 (N.M. 2018). The contract there involved the removal of condensate and other particulates from the slug catcher, which required periodic cleaning to remain functional. *Id*. ¶ 4. One party argued that the work at issue was merely cleaning rather than construction activity within the statute's scope and compared it to janitorial tasks such as sweeping floors or removing trash. *Id*. ¶¶ 33–34. The court rejected that characterization. It held that the slug catcher was a structure on real property and that the work performed on it constituted "maintenance of that structure," placing the work within § 56-7-1's scope. *Id*. ¶ 35. The court further found that without regular cleaning, the slug catcher would be rendered inoperable, which confirmed that the work was maintenance rather than simple cleaning. *Id*. ¶ 34. The equipment and contract in *Holguin* are not identical to those in this case, but *Holguin*'s analysis is instructive because the nature and purpose of the work are closely comparable to those in this case.

Applying the same reasoning, the determination here is more straightforward. J&M's welding and siphon-installation work on the RR4-6-7 pipeline can be more readily characterized as maintenance or improvement on construction than the cleaning work at issue in *Holguin*. The RR4-6-7 line is part of DCP's gas-processing infrastructure, and the siphons installed by J&M removes condensate to maintain the line's flow. Def.'s UMF ¶¶ 2, 3. If cleaning a slug catcher qualified as maintenance under § 56-7-1, installing siphons and welding on a gathering line connected to the mainline is at least as much within that category.

This reading aligns with New Mexico courts' broad construction of § 56-7-1, that "[i]nstead of writing a narrow anti-indemnification statute that addressed only contracts *for* construction, the Legislature defined the statutory scope as including all contracts *relating to* construction." *Yearout Mech., Inc.*, 237 P.3d at 733. The term "relating to" is defined broadly to encompass any connection or reference to such activities. *Id.*; see also *Holguin*, 245 P.3d, ¶¶ 30–32.

Accordingly, § 56-7-1 applies to the MGSA. The statute therefore voids any provision requiring J&M to indemnify or insure DCP for DCP's own negligence and limits St. Paul's coverage to losses caused by J&M's own negligence or fault.

DCP asserts that the statute is irrelevant even if it applies to the MGSA and the Policy because neither requires St. Paul to indemnify or defend DCP for DCP's own negligence or fault. Doc. 57 at 19.

Yet DCP simultaneously advances a reading in its pleadings that cannot be reconciled with the anti-indemnity statute. It claims that the MGSA requires indemnification irrespective of J&M's negligence. Doc. 57 at 2. This position contradicts § 56-7-1 because it would allow indemnity or defense even when the indemnifying party is not negligent or at fault.

Contrary to DCP's argument, the indemnity clause in the MGSA can be read in a way that violates § 56-7-1. The indemnity clause requires the indemnifying party to indemnify (i) bodily injury or property damages directly or indirectly caused by the Indemnifying Party's Group or Personnel, or (ii) a negligent or wrongful act or omission of the indemnifying party. Doc. 55-1 at 10. The canon against superfluity instructs courts to avoid interpretations that render contractual terms meaningless. Subparagraph (ii) already addresses "a negligent or wrongful act or omission of the Indemnifying Party;" if subparagraph (i) only covers negligent conduct, it merely repeats subparagraph (ii) and renders it superfluous. To the extent subparagraph (i) allows indemnity when the indemnifying party bears no fault, it runs afoul of § 56-7-1.

The Court therefore concludes that the MGSA's indemnity provision is enforceable only insofar as it requires J&M to indemnify DCP for bodily injury caused by J&M's own negligence or fault.

### IV. St. Paul Has a Duty to Defend; however, the Duty to Indemnify Cannot Be Resolved at Summary Judgment Stage Due to Material Factual Disputes.

#### a. St. Paul Has a Duty to Defend Because the Underlying Allegations Are Potentially Within the Scope of Coverage.

Under New Mexico law, "an insurer's duty to defend is independent of its duty to insure." *Proassurance Specialty Ins. Co. v. Familyworks, Inc.*, 599 F. Supp. 3d 1082, 1092–93 (D.N.M. 2022) (citing *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994)); *Found. Res. Ins. Co. v. Mullenix*, 642 P.2d 604, 606 (N.M. 1982). It is determined not by the actual underlying facts of the transaction, as the coverage issue is, but by "the allegations of the injured party's complaint." *Id*. The duty to indemnify, on the other hand, is "determined . . . by the actual underlying facts of the transaction;" mere allegations will not suffice. *Familyworks, Inc.*, 599 F. Supp. 3d at 1092.

18

If the allegations in the underlying complaint show that an accident or occurrence potentially falls within the coverage of the policy, the insurer must defend, regardless of the insured's ultimate liability. *W. Heritage Bank v. Fed. Ins. Co.*, 938 F. Supp. 2d 1219, 1223 (D.N.M. 2013) (citing *Am. Emp'rs' Ins. Co. v. Cont'l Cas. Co.*, 512 P.2d 674, 676 (N.M. 1973)). Because this determination turns on the allegations alone, the duty to defend is decided as a matter of law. *Acuity v. Astora*, No. 20-CV-37 SWS/MLC, 2020 WL 892931, at *6 (D.N.M. Apr. 16, 2020); *W. Heritage Bank,* 938 F. Supp. 2d 1223; *W. Am. Ins. Co. v. Atyani*, 366 F. Supp. 3d 1270, 1274 (D.N.M. 2019) (holding that in New Mexico, the insurer has a duty to defend unless the insurer shows as a matter of law that the insurance policy excludes all claims arise from the injury). The insurer bears the burden of proving that there is no duty to defend, and "any doubt about whether the allegations are within policy coverage is resolved in the insured's favor." *State Farm Fire & Cas. Co. v. Price*, 684 P.2d 524, 528 (N.M. Ct. App. 1984). "If the allegations on the face of the complaint are 'potentially' or 'arguably' within the scope of coverage, the insurer is obligated to defend." *Servants of Paraclete, Inc. v. Great Am. Ins. Co.*, 857 F. Supp. 822, 829 (D.N.M. 1994); *see also Dove v. State Farm Fire & Cas. Co.*, 399 P.3d 400, 404 (N.M. Ct. App. 2017).

By contrast, the duty to indemnify turns on the actual facts and is determined only after the insured's liability is established in the underlying action. *See Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, 864 F. Supp. 2d 1157, 1193 (D.N.M. 2012). A court will "leave[ ] for later" determination whether the insurer must indemnify the insured, because that "ultimate determination is based on whether the insurer became legally obligated to pay damages because of a bodily injury or property damage that does, in fact, fall under the policy coverage." *Id*. (citing 12 *Couch on Insurance* § 172:2 (Supp.2011)); s*ee also Valley Imp. Ass'n v. U.S. Fid. & Guar. Corp.*, 129 F.3d 1108, 1126 (10th Cir. 1997) (finding that, under New Mexico law, a judgment

19

regarding the duty to indemnify would be "premature," because "the duty to indemnify must be determined based on the facts as ultimately determined in the litigation against the insured").

St. Paul argues that it has no duty to defend DCP because the underlying complaint alleges negligence only by DCP and none by J&M. Def.'s Resp. at 18; Doc. 67 at 16–17. St. Paul contends that any negligence claim against J&M's employees would also have been barred by the New Mexico Workers' Compensation Act, and thus the plaintiffs in the Underlying Action could not have asserted such claims at all. Def.'s Resp. at 22. On this basis, St. Paul maintains that the complaint's allegations clearly fall outside the policy, which limits coverage to losses caused by J&M's negligence. *Id*. at 17.

DCP disagrees, arguing that St. Paul improperly ties the duty to defend to the indemnity clause in the MGSA. Pls.' Reply at 7. DCP relies on Section 14E of the MGSA, which provides that the indemnity obligations "shall apply regardless of the amount of insurance coverage held by [J&M] . . . and shall be both independent of and not limited by or to any insurance carried or provided." *Id*. According to DCP, this language makes clear that J&M's indemnity obligations are not conditioned on J&M's negligence or limited by the scope of insurance coverage. *Id*. at 7–9. DCP further contends that the policy covers injuries that "result[] from" J&M's work, and that St. Paul's refusal to defend on the ground that the complaint did not allege J&M's negligence misinterprets both the MGSA and the policy. *Id*. at 5–6. But, as explained above, the Court has already determined that the construction anti-indemnity statute governs the MGSA and requires negligence by the indemnifying party as a condition of enforceable indemnity. In light of that statutory constraint, DCP's "results from" standard cannot control.

With the statutory issue resolved, the Court turns to the governing framework for determining whether St. Paul owed a duty to defend. New Mexico courts determine the existence

of the duty to defend by comparing the policy language with the allegations of the third-party complaint. *W. Heritage Bank*, 938 F. Supp. 2d at 1223; *Am. Emp'rs Ins. Co.*, 512 P.2d at 676. The key question is whether the alleged facts may fall within the policy's coverage, not whether coverage will ultimately be established. *Dove*, 399 P.3d at 406 (citing *Price v. State Farm Mut. Auto. Ins. Co.*, 684 P.2d 524, 528 (N.M. Ct. App. 1984)).

St. Paul errs in asserting that there can be no coverage simply because the underlying complaint does not allege negligence by its named insured. *See Windham v. L.C.I.2, Inc.*, 268 P.3d 528 (N.M. Ct. App. 2011). *Windham* squarely rejects that position. In *Windham,* the subcontractor's liability insurer intervened in a personal injury action brought by the subcontractor's employees, seeking a declaration that it had no duty to defend or indemnify the general contractor against the employee's claims. *Id*. ¶ 4. As here, the named insured was not a party to the suit, the underlying complaint alleged no negligence by the named insured, and there had been no finding of such negligence. *Id*. ¶ 11. Nevertheless, relying on *City of Albuquerque v. BPLW*, *Windham* held that the insurer owed a duty to defend the general contractor, even in the absence of any allegation or finding of negligence by the insured subcontractor. *Id*. ¶ 18 (citing *City of Albuquerque v. BPLW*, 213 P.3d 1146 (N.M. Ct. App. 2009)).

St. Paul contends that *Windham* should be distinguished because it involved a broader grant of coverage than the one at issue here. Doc. 68 at 13. The insurance policy in *Windham* extends to "liability arising out of [the subcontractor's] ongoing operations performed for [the contractor]," which St. Paul argues extends to the full range of work the subcontractor performed for the contractor. *Windham*, 268 P.3d 528, ¶ 18. By contrast, St. Paul maintains that its own policy, when read together with the MGSA, is narrower and extends only to losses caused by J&M's negligence. Def.'s Resp. at 13; Def.'s SJ Mot. at 13.

The Court disagrees.  The relevant language of the MGSA and the Policy are not materially different from the provisions at issue in *Windham* and *BPLW*, especially under the interpretation that St. Paul advances.  St. Paul argues that the duty to defend and indemnify arises only when the indemnifying party is negligent or otherwise at fault, which is the same limitation reflected in the provisions considered in *Windham* and *BPLW*.  Both cases were governed by New Mexico's anti-indemnity statute.[4]  *Windham*, 268 P.3d 528, ¶ 14; *BPLW*, 213 P.3d 1146, ¶ 17.  In each case, the court held that even where indemnity is limited to the indemnifying party's own negligence, the duty to defend existed because the complaints potentially brought the damages within the insurance coverage.  *Windham*, 268 P.3d 528, ¶ 18; *BPLW*, 213 P.3d 1146, ¶ 17 ("Here, requiring [the indemnitor] to fulfill its contractual obligation to defend the [the indemnitee] against any suit against the [the indemnitee] arising out of [the indemnitor]'s alleged negligence in the performance of the contract does not violate Section 56–7–1 or the policy behind it.  Instead, this interpretation of the contract is fully consistent with the requirements of the statute.")

Here, the parties dispute the factual record concerning negligence in the Underlying Action. DCP points to the deposition of its supervisor, David Bannan, who testified that Saenz and Owens disregarded his instructions to stop operating equipment.  Pls.' SJ Mot. at 8; Ex. I Banman Dep. 171:12–16.  St. Paul counters by citing the depositions of Saenz and Owens, who testified that they did not hear such instructions.  Def.'s Resp. to Pls.' UMF ¶ 10.  St. Paul also points to testimony indicating that DCP's gas monitors had alarmed repeatedly before the fire and that J&M's employees were never warned of the danger.  Def.'s Resp. at 3.  These competing accounts raise a genuine question of fact as to whether negligence may be attributed to J&M, DCP, or to both.  The factual uncertainty alone is sufficient to bring the underlying claims within the scope of

---

[4] *BPLW* and *Windham* applied an earlier version of the statute, but the subsequent amendments are not material here and do not affect the analysis.

St. Paul's policy. *Sw. Steel Coil, Inc. v. Redwood Fire & Cas. Ins. Co.*, 148 P.3d 806, 812–13 (N.M. Ct. App. 2006). The underlying complaint, though not expressly alleging J&M's negligence, includes factual statements from which J&M's potential negligence could be inferred. For instance, the underlying complaint alleges that "Defendant DCP Midstream, LP hired Diversified Field Services to weld a flange on the pipeline," that "Plaintiffs Manuel Saenz and Jose Owens, employees of Diversified, arrived at the pipeline location early on October 28, 2021," and that "Defendant Watkins then told Plaintiff Owens that the flange was ready to be welded." Pls.' UMF Fact No. 13; Def.'s Resp. to Pls.' UMF ¶ 9. These allegations describe the relationship between DCP and J&M and the sequence of events leading to the fire in a manner that may implicate the adequacy of J&M's performance. The fact that DCP hired J&M may raise questions about whether contractual standards were followed, and timing may further suggest potential issues about the supervision, qualification, and preparation of the workers involved. Together, these facts leave open the possibility that the accident resulted, at least in part, from J&M's negligence or faults, and such potential for J&M's negligence is sufficient to trigger St. Paul's duty to defend under the MGSA and the Policy. *Dove*, 399 P.3d at 404 ("[T]here is a duty to defend when the facts in the complaint 'are not stated with sufficient clarity so that it can be determined from the face of the complaint whether the action falls within the coverage of the policy.'")

Moreover, even if St. Paul insists that the underlying complaint lacks specific allegations establishing coverage, the duty to defend may still arise where the insurer is aware of, or could have discovered through reasonable investigation, facts indicating potential coverage. *Dove*, 399 P.3d at 408. An insurer's duty to defend may be triggered by facts learned during discovery or investigation when those facts reveal that the claim potentially falls within coverage. *Sw. Steel Coil, Inc.*, 148 P.3d at 812. DCP raises issues concerning J&M's compliance with the MGSA,

including whether it followed required safety protocols, properly trained its workers, and ensured adequate equipment and supervision.  Pls.' UMF Fact No. 19; Def.'s Resp. to Pls.' UMF ¶ 13. These issues, combined with the underlying factual disputes, create sufficient uncertainty to trigger the duty to defend.  When the facts in the complaint are not stated with sufficient clarity to determine whether the alleged conduct falls within the scope of coverage, the insurer must resolve that doubt in favor of the insured.  *Am. Emp'rs Ins. Co.*, 512 P.2d at 676; *Price*, 684 P.2d 524.

The duty to defend is broader than the duty to indemnify.  *W. Am. Ins. Co. v. Atyani*, 366 F. Supp. 3d 1270, 1274 (D.N.M. 2019).  The Policy extends St. Paul's duty to defend even to claims or suits in which the allegations may be "groundless, false, or fraudulent," and the duty continues unless and until the claim is clearly shown to fall outside the scope of coverage.  Doc. 55-1 at 23. The operative question is whether the facts alleged in the underlying complaint, considered together with information reasonably available to St. Paul at the time of tender and any later-discovered facts, presented a potential for coverage under the MGSA and the Policy.  *See Sw. Steel Coil, Inc.*, 148 P.3d at 812.  The Court concludes that they did, as both the allegations and the subsequent development of the record potentially implicate J&M's negligence.

St. Paul's refusal to defend rests on its contractual and statutory interpretation of the MGSA, the Policy, and the New Mexico anti-indemnity statutes, which all boils down to the view that negligence on the part of J&M is required to trigger coverage.  *See* Def.'s Resp. at 4.  While that interpretation is reasonable and the Court accepts it for purposes of this motion, it does not clearly rule out coverage in light of the factual disputes in this case.  Negligence remains a factual question, and St. Paul has not shown that the dispute over J&M's alleged conduct can be resolved in a manner that eliminates doubts about coverage.  Even under St. Paul's own view that coverage depends on negligence by J&M, the current record does not foreclose the possibility that J&M's

conduct contributed to the accident.  Because that possibility remains, St. Paul has a duty to defend.  When an insurer declines coverage amid factual uncertainty, it assumes the risk that its decision will later be found erroneous.

      b.  <u>Resolution of the Duty to Indemnify Is Premature Due to Disputed Material Facts Regarding Negligence.</u>

DCP seeks partial summary judgment on St. Paul's duty to defend.  Pls.' SJ Mot. at 1.  St. Paul moves for summary judgment on DCP's breach of contract claim, which encompasses an alleged breach of the duty to investigate, the duty to defend, and the duty to indemnify.  Def.'s SJ Mot. at 1.  As to the duty to investigate, St. Paul as the moving party does not develop an argument or present evidence showing that it adequately investigated DCP's claim in its pleadings.  From the available records, St. Paul declined coverage principally on the ground that the Underlying Action alleged no claims against J&M that would trigger St. Paul's duties to defend or indemnify under the Policy.  *See* Def.'s Resp. at 4.

      Unlike the duty to defend, the issue of indemnification cannot be resolved on the present record.  Although the amount of the Underlying Action settlement has been established, genuine disputes of material fact prevent the Court from determining whether St. Paul must pay that settlement or ultimately owes indemnity.

      As part of its review, the Court takes judicial notice of the publicly available docket in *DCP Midstream, LP v. J&M*, filed in Colorado state court, which reflects that the parties reached a settlement.  *DCP Operating Co. v. J&M Welding & Fabrication, Inc.*, No. 2023CV031339, Stip. of Voluntary Dismissal with Prejudice (Dist. Ct. Denver Cnty. Dec. 31, 2024).  The settlement resolved that case without adjudicating the issue of indemnity or determining fault between DCP and J&M.  Accordingly, it provides no additional factual basis for deciding the indemnification issues presented here.

There are two components to the indemnity issue in this case.  The first is whether St. Paul must reimburse DCP for the Underlying Action settlement in light of the Court's determination that it owes a duty to defend.  "New Mexico courts have consistently held that the insurer who unjustifiably refuses to defend its insured is only bound to a settlement that is reasonable and was entered in good faith . . . New Mexico law requires that settlements entered without the insurer's knowledge or consent be reasonable and in good faith, even if the insurer breached its duty to defend."  *State Farm Fire & Cas. Co. v. Ruiz*, 36 F. Supp. 2d 1308, 1319 (D.N.M. 1999) (first citing *Cont'l Cas. Co. v. Westerfield*, 961 F. Supp. 1502, 1504–1505 (D.N.M. 1997); then citing *Progressive Cas. Co.*, 799 P.2d at 1117–18 ("[T]he settlement must be reasonable, and the insurer is not precluded from asserting as a defense that the settlement was unreasonable."); and then citing *Price*, 684 P.2d at 530–31 ("The settlement must be reasonable . . . On retrial jury issues may include Price's good faith in making the settlement and the reasonableness of its amount.")).  The parties do not present undisputed facts permitting the Court to find that the settlement was reasonable or to conclude otherwise.  On the current record, the reasonableness and good-faith requirements cannot be adjudicated at the summary judgment stage.

The second component is St. Paul's ultimate obligation to indemnify liabilities arising from J&M's conduct.  That question hinges on whether J&M was negligent, which is a factual question that cannot be decided at summary judgment when the material facts are disputed.  As discussed above, the record contains genuine disputes regarding the circumstances of the accident and the performance of both DCP and J&M.  These disputes are material because the Policy and the MGSA limit St. Paul's indemnity obligation to losses attributable to J&M's fault.  With those facts unsolved, summary judgment is improper, and the question of indemnity must be decided by the factfinder.

Accordingly, the Court denies summary judgment on the indemnification claim. Whether St. Paul must reimburse the settlement will depend on a developed record addressing the reasonableness of the settlement and the parties' good faith, and the question of ultimate indemnity will require factual determinations of negligence and causation, which cannot be resolved as a matter of law at this stage.

## V.    The Colorado Court's Ruling Has No Preclusive Effect Because It Is Not a Final Judgment.

Relevant to the Underlying Action, DCP filed suit against J&M in Colorado pursuant to the forum-selection clause in the MGSA that designates Colorado as a proper forum for litigation. Pls.' Reply at 10–12. In that action, DCP alleged that J&M owed DCP defense and indemnification of the Underlying Action. Doc. 57-1 at 11. J&M moved for summary judgment on the defense and indemnification claims, and the Colorado court denied the motion. *Id*. at 9–10, 14.

In doing so, the court explained that Colorado law provides a well-established process for pursuing indemnity against a party that denies liability and refuses to assume the defense. Doc. 57-1 at 75. Under that process, the indemnitee may first enter into a reasonable, good-faith settlement with the claimant and then seek recovery from the indemnitor in a later action. The indemnitee need not prove absolute legal liability, the actual amount of damages, or even the specific amount of a reasonable settlement. *Id*. Rather, the indemnitee must show only that "[the indemnitor] was potentially liable to the claimant and that the settlement amount was reasonably related to the liability exposure and the employee's injuries." *Id*.

The Colorado court further determined that DCP is entitled to pursue indemnity under the MGSA, and that "[t]he MGSA unambiguously obligates J&M to defend and indemnify DCP from losses" to the extent that DCP's losses arose out of bodily injury "directly or indirectly caused" by J&M or by any "negligent or wrongful act or omission of" J&M. *Id*. The Colorado court also

rejected J&M's argument that the New Mexico Workers' Compensation Act barred recovery. *Id.* As a result, DCP contends that the Colorado court's ruling has preclusive effect and should control this Court's analysis. Pls.' Reply at 10–12.

The Court concludes that the Colorado court's ruling does not have collateral-estoppel effect because it is not a final judgment subject to full faith and credit. The Full Faith and Credit Clause applies only to final judgments. *Franchise Tax Bd. of Cal. v. Hyatt,* 538 U.S. 488, 494, (2003) (noting the "exacting" nature of the Full Faith and Credit Clause with respect to final judgments). Federal courts must "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Zvunca ex rel. Klein v. Greyhound Lines, Inc.*, 530 F. App'x 672, 675 (10th Cir. 2013); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). An order "denying a motion for summary judgment is properly considered as one of those intermediate orders which by their nature do not involve the merits and necessarily affect the final judgment." *Manuel v. Fort Collins Newspapers, Inc.*, 631 P.2d 1114, 1116–17 (Colo. 1981). Rather, the entry of such an order merely indicates that the trial court considers that the matter should proceed to trial on the merits. *Id.* To hold otherwise could lead to the absurd result that one who has sustained his position after a full trial and a more complete presentation of the evidence might nevertheless be reversed on appeal because he had failed to prove his case fully at the time of the hearing on the motion for summary judgment. *Id.*

Even if the Colorado ruling were afforded persuasive weight, the order merely determined that DCP is entitled to *pursue* indemnity claims under the MGSA. It does not constitute a conclusive finding that J&M, or by extension St. Paul, has a duty to indemnify. The ruling simply allowed DCP to proceed with its indemnity claim and did not resolve the merits of that claim.

Accordingly, this Court finds that the Colorado court's denial of J&M's motion for summary judgment is not a final order and therefore does not have collateral-estoppel effect. The ruling does not bind this Court in determining issues of negligence or indemnification between DCP and St. Paul.

## VI.    Workers' Compensation Act Does Not Affect the Coverage Analysis.

St. Paul argues that Owens and Saenz could not have brought negligence claims against J&M because their injuries fall within the exclusive remedy of the New Mexico Workers' Compensation Act. Def.'s Resp. at 22. St. Paul therefore contends that, because the Workers' Compensation Act bars Owens and Saenz from asserting negligence claims against J&M, DCP cannot establish any basis for coverage. *Id.*

DCP responds with several counterarguments. First, DCP refers to the Colorado court's ruling, which noted that workers' compensation exclusivity bars only an employee's direct claim against the employer and has no bearing on the employer's separate contractual obligations. Doc. 57 at 22–23. Second, DCP argues that the parties were free to contract around the limitations of workers' compensation exclusivity in New Mexico, and when they do, it does not bear on the anti-indemnity statutes. *Id.* at 23. The Court agrees the Workers' Compensation Act, even if it limits an employee's ability to sue an employer, does not restrict the contractual coverage at issue here. *See City of Artesia v. Carter*, 610 P.2d 198, 201 (N.M. Ct. App. 1984) ("The workmen's compensation statute does not bar an indemnity claim by a third party against an employer when that claim is based on an express contract of indemnity.").

As this Court has already discussed in its analysis of the duty to defend, the absence of an express negligence claim against J&M in the Underlying Action does not eliminate coverage where the factual allegations could potentially bring the damages within the policy's scope. The absence

of an explicit negligence allegation against the named insured does not defeat an insurer's duty to defend. *Windham*, 268 P.3d 528 ¶ 11.

Accordingly, the Court concludes that the Workers' Compensation Act does not preclude DCP's contractual claims for defense and indemnification.

## VII.    DCP Has Standing to Assert Claims Against St. Paul.

St. Paul argues that DCP Midstream, LP ("DCP Midstream") is not a party to the MGSA and therefore lacks standing to bring claims against St. Paul. Def.'s Mot. for SJ at 26. The DCP entity that signed the MGSA is DCP Operating Company, LP ("DCP Operating"), a Delaware limited partnership. Def.'s Mot. for SJ at 26 (citing Def.'s UMF ¶¶ 12, 15).[5] The MGSA requires J&M to add DCP Operating, "its Affiliates, and their respective directors, shareholders, members, partners, and employees" as additional insureds in the Policy and indemnify DCP Operating's "Group," which is DCP Operating, "its Affiliates, and their respective officers, directors, shareholders, members, partners, and employees and assigns." *Id.* (citing Def.'s UMF ¶ 14).

The MGSA further defines "Affiliates" as a "Person controlling, controlled by, or under common control with a party." *Id.* (citing Def.'s UMF ¶ 13). According to St. Paul, this definition limits the contractual right to defense and indemnity to DCP Operating and its affiliates, and DCP Midstream, though a related entity, is not included within that group. St. Paul contends that DCP Midstream therefore lacks contractual rights under the Policy and the MGSA and therefore judgment in St. Paul's favor is appropriate. *Id.* at 26.

DCP responds that DCP Midstream was "simply a [f/k/a] of DCP Operating Company." Doc. 57 at 23. DCP asserts that DCP Midstream and DCP Operating share common ownership and that "control" within the meaning of the MGSA is necessarily exercised across DCP entities.

---

[5] St. Paul suggests that there are two versions of the MGSA and signature of the executed version seems to be cut and pasted from another version, but relevant discovery has not been conducted.

*Id.* at 24.   Under this view, DCP Midstream is either the same legal entity as DCP Operating or is a qualifying affiliate that can enforce the Policy.   *Id.*

The Court interprets the MGSA with Colorado law as indicated in the agreement's choice of law clause.   Ex. J at 24.   MGSA's phrasing of its definition of "Affiliate" closely tracks the terminology used in Colo. Rev. Stat. § 7-101-401 (9), which defines "affiliates" as "any person that directly or indirectly through one or more intermediaries *controls, or is controlled by, or is under common control* with, the person specified."   Colo.Rev.Stat. § 7-101-401(2) (emphasis added).   The same statute defines "control" as "the possession, *direct or indirect,* of *the power to direct or cause the direction of the management and policies* of an entity, whether through *the ownership of voting shares, by contract,* or otherwise."   Colo.Rev.Stat. § 7-101-401(9) (emphasis added).   However, it does not specify any definitive percentage of ownership required to establish "control."   *See* § 7-101-401(2), (9); *Puls v. Landmark Cmty. Newspapers, Inc.*, 335 F. App'x 805, 810–11 (10th Cir. 2009).

Based on the corporate structure reflected in the record, DCP Operating sits at the top of a continuous ownership and management chain that includes DCP Operating Company, LP (Plaintiff), DCP LP Holdings LLC, DCP Assets Holding, LP, DCP Midstream Operating LP, and then DCP Midstream, LP (Plaintiff).   Doc. 54 at 4.   This arrangement demonstrates that DCP Operating indirectly controls DCP Midstream through a series of intermediate partnership and holding entities that share common ownership.

There is no dispute that DCP Operating is a party to the MGSA and has standing to assert contractual rights for defense and indemnity against St. Paul.   Def.'s Mot. for SJ at 26 (citing Def.'s UMF ¶¶ 12, 15).   Regardless, St. Paul is not entitled to summary judgment on this basis alone.

## CONCLUSION

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' motion for partial summary judgment on duty to defend is GRANTED as to St. Paul's duty to defend and DENIED as to indemnification of the Underlying Action.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment on breach of contract claim is denied.

_____

**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**